## THE BOUKER NO. 2.

### (Circuit Court of Appeals, Second Circuit.  March 20, 1917.)

### No. 170.

1. **SEAMEN** ⊙⇒11—**INJURY OR ILLNESS WHILE IN SERVICE—RIGHT TO MAINTENANCE AND CURE.**
   A seaman comes within the rule that he is entitled, within certain limitations, to maintenance and cure at the expense of the vessel or owner, if he "falls sick or is wounded in the service of the ship," if such misfortune happens to him while attached to the ship as a part of her crew; and it is not necessary that the wound or illness should be directly caused by some proven act of labor, but it is sufficient that he was, when incapacitated, subject to the call of duty as a seaman and earning wages as such.

   [Ed. Note.—For other cases, see Seamen, Cent. Dig. §§ 39–44, 187.]

2. **SEAMEN** ⊙⇒2—**WHO ARE SEAMEN—INJURY OR ILLNESS IN SERVICE.**
   An engineer, even on a harbor tugboat, is a seaman, within the rule which entitles him to maintenance and cure when he is injured or becomes ill in the service of the vessel.

   [Ed. Note.—For other cases, see Seamen, Cent. Dig. §§ 1–3.]

3. **SEAMEN** ⊙⇒11—**INJURY IN SERVICE—LIABILITY OF VESSEL FOR MAINTENANCE AND CURE.**
   The liability of a ship for the expense of caring for a seaman who is ill or injured may extend for a reasonable time beyond his term of service, when necessary to effect a cure.

   [Ed. Note.—For other cases, see Seamen, Cent. Dig. §§ 39–44, 187.]

4. **SEAMEN** ⊙⇒11—**INJURY IN SERVICE—LIABILITY OF VESSEL FOR MAINTENANCE AND CURE.**
   The limits of the liability of a ship for the care and cure of an injured or sick seaman, both as to kind of treatment and time of continuance, must always depend upon the facts of each particular case.

   [Ed. Note.—For other cases, see Seamen, Cent. Dig. §§ 39–44, 187.]

5. **SEAMEN** ⊙⇒11—**ILLNESS CONTRACTED IN SERVICE—LIABILITY FOR MAINTENANCE AND CURE.**
   Libelant, while serving as engineer on a New York harbor tug, engaged chiefly in towing scows to the dumping grounds, became ill and went to his home in New Jersey, where it was found that he had pneumonia, and he was unable to work for 11 months thereafter, being a part of the time in a private room in a hospital, where he had a surgical operation. Shortly after he left the tug, his wages were sent him. There was a marine hospital, to which he could have been sent; but apparently neither he nor his employers considered or thought of it. *Held*, that the tug was liable for libelant's care in the way of maintenance and ordinary medical treatment for a reasonable time, for as long as he would probably have remained in the marine hospital, had he been sent there, but that such liability did not include the cost of a private room in the hospital, nor the surgeon's charge of $350.

   [Ed. Note.—For other cases, see Seamen, Cent. Dig. §§ 39–44, 187.]

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by Fred B. Jones against the steam tug Bouker No. 2; the Bouker Contracting Company, claimant. Decree for libelant, and claimant appeals. Modified and affirmed.

For opinion below, see 231 Fed. 254.

⊙⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The libelant, Jones, is a marine engineer, and in April, 1914, was, and had been for about two months, in charge of the engines of the Bouker No. 2, a tug engaged principally in the business of towing scows laden with city refuse out to the dumping grounds beyond Scotland Lightship. In good weather, two trips a day were accomplished. In no other sense could the tug be said to make voyages. Jones was paid by the week, and was entitled to food and quarters at the tug's expense, as well as money wages. He remained on board a week or more at a time, and then went home for brief periods, to his house not far from Plainfield, N. J., where he lived with his wife. His earnings in money amounted to about $100 per month.

For a few days before April 16, 1914, Jones felt unwell, and on that day declared himself too sick to work, left the boat at Communipaw, went home by train, and called a doctor, who found him with a fever, and on the 20th declared the disease to be pneumonia. Libelant remained at home, and quite ill, until May 23d, when he was taken to a private room at the Muhlenberg Hospital in Plainfield, where he remained until July 19th, during which time he endured the operation for relief of the pleural cavity; i. e., removal of part of a rib for drainage purposes. He then returned home, was treated medically until November, and did not feel able to resume work until the following March—a period of 11 months. Soon after leaving the tug he received his wages in full, and a gratuity of $25, from the claimant. No request or suggestion was made by libelant or any one else that he go to the Marine Hospital, a course undoubtedly open to him, and owing to the proximity of that institution far easier and attended with less exposure than traveling by rail from Communipaw to his home.

On August 27, 1915, this libel was filed (in forma pauperis) claiming $800 for maintenance and cure and additional damages or indemnity, upon allegations that libelant's pneumonia was caused by the unwholesome, if not unseaworthy, condition of the Bouker No. 2, in respect of the sleeping quarters occupied by libelant and others. The libel was not sustained, so far as any wrong doing or neglect of the owners or master was concerned, and libelant did not appeal. For maintenance and cure the court decreed payment of $1,091.90, made up as follows:

(1) Charges of Muhlenberg Hospital for (say) two months........$ 284.90
(2) Bill of surgeon for operation............................... 350.00
(3) Charges of physician privately employed by libelant........ 102.00
(4) Amount paid a woman hired to assist libelant's wife in house-
     work, while the wife was busied in attending on her husband   85.00
(5) "Maintenance" at the agreed rate of $1 per day for 11 months,
     less two months spent in hospital.......................... 270.00

$1,091.90

Of these items Nos. 1, 3, and 4 represent actual disbursements by libelant, 5 is an estimate by agreement, and 2 has never been paid, nor has any effort to collect been made (so far as appears), otherwise than by this action.

From this decree claimant appealed, assigning for error in substance (1) that the tug was held for any expense of maintenance and cure; (2) that any liability therefor had been upheld after termination of liability for libelant's wages; (3) that any recovery had been granted, when libelant might have gone to the Marine Hospital, and did not choose so to do; and (4) that under any circumstances the award was excessive.

William J. Martin, George V. A. McCloskey, and Foley & Martin, all of New York City, for appellant.

Silas B. Axtell and Frederick R. Graves, both of New York City, for appellee.

Before COXE, ROGERS, and HOUGH, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). The problem presented by this appeal is to square the rights of parties with so much of the decision in The Osceola as declared that:

"The vessel and her owners are liable, in case a seaman falls sick, or is wounded, in the service of the ship, to the extent of his maintenance and cure, and to his wages, at least so long as the voyage is continued." 189 U. S. 175, 23 Sup. Ct. 487 (47 L. Ed. 760).

The last phrase of this quotation deliberately (doubtless) left undecided the query, not involved in the case then at bar, whether a seaman's right to maintenance and cure depended upon and ceased with, his right to wages. Upon this point opinion, even since The Osceola, has perhaps varied. Cf. The Nyack, 199 Fed. 383, 118 C. C. A. 67 (C. C. A. 7th), and The Mars, 149 Fed. 729, 79 C. C. A. 435 (C. C. A. 3d).

This court has several times adverted to the general rule, but always without reference to the time when the seaman's privilege ends. Cornell Steamboat Co. v. Fallon, 179 Fed. 293, 102 C. C. A. 345; The New York, 204 Fed. 764, 123 C. C. A. 214; The Transfer No. 12, 221 Fed. 409, 137 C. C. A. 207. Numerous as are the reported litigations on this subject, we find, therefore, neither controlling authority, nor any complete consensus of opinion, as to the point left open in The Osceola, nor has our attention been directed to any decisions dealing with the cost or reasonable expense of attempted cure; neither has the length of time during which the seaman's right persists (in the event of chronic illness or long convalescence) received much judicial treatment.

[1, 2] Before considering these questions, now acutely presented upon a meager and inadequate record, we may state our opinion that a seaman "falls sick, or is wounded, in the service of the ship," if such misfortune attacks him while he is attached to the ship as part of her crew. It is not necessary that the wound or illness should be directly caused by some proven act of labor; it is enough that he was, when incapacitated, subject to the call of duty as a seaman, and earning wages as such.[1] We further hold that an engineer, even on a harbor tugboat, is a seaman, within the meaning of the rule. If authority be needed for these propositions, it is found in the citations already made; indeed, there has been at bar no denial of their truth.

[3] The courts in this circuit have several times considered cases of seamen demanding cure after voyage ended, and consequent termination of the wage relation. Judge Betts' earlier decisions (Nevitt v. Clarke, Olc. 316; The Atlantic, 1 Abb. Adm. 451; Ringgold v. Crocker, 1 Abb. Adm. 344) were reviewed by Judge Addison Brown in The City of Alexandria (D. C.) 17 Fed. 390, and The W. L. White (D. C.) 25 Fed. 503, with due consideration of Reed v. Canfield, 1 Sum. 195, Fed. Cas. No. 11,641, out of which opinion of Justice Story this subdivision of the law has undoubtedly grown so far as the American admiralty is concerned. Since The W. L. White it has been the rule of such of the District Courts in this circuit as have had the question presented to hold that a seaman's right to maintenance and cure persisted for the duration of the voyage and a reasonable time thereafter, a doctrine largely based upon the words of Betts, J. (in commenting on Justice Story's decisions), that:

[1] This statement is made without overlooking the exception that sickness or injury occasioned by the seaman's willful wrongdoing gives him no rights against vessel or owners.

"When a course of medical treatment necessary and appropriate to the cure of a seaman has been commenced and is in course of favorable termination, there would be an impressive propriety in holding the ship chargeable with its completion, at least, for a reasonable time after the voyage is ended, or the mariner is at home.". The Atlantic, supra.

This view was enforced by Benedict, J., in The Wensleydale (D. C.) 41 Fed. 829, which is one of the very few cases of sickness, as distinct from violent injury, to be found reported. It was assumed without discussion by Adams, J., in The Charles H. Klinck (D. C.) 172 Fed. 1019, and there is nothing opposed thereto in The Bunker Hill (D. C.) 198 Fed. 587, where the point was not in issue.

That the ship's duty and seaman's right do not terminate with the voyage has also been held in the First circuit (McCarron v. Dominion, etc., Co. [D. C.] 134 Fed. 762, per Lowell, J.; The Henry B. Fiske [D. C.] 141 Fed. 188, per Dodge, J.), in the Third (The Mars, supra; The Teviotdale [D. C.] 166 Fed. 481, per Holland, J.; Dougherty v. Thompson-Lockhart Co. [D. C.] 211 Fed. 224, per McPherson, J.), in the Fifth (The Lizzie Frank [D. C.] 31 Fed. 477, per Toulmin, J.), and in the Ninth (The Chandos [D. C.] 4 Fed. 645, per Deady, J.; Wilson v. Manhattan, etc., Co. [D. C.] 205 Fed. 996, per Cushman, J.; The C. S. Holmes [D. C.] 209 Fed. 970, per Neterer, J.). The question was argued in the Supreme Court of Pennsylvania in 1883, and a similar ruling made in Holt v. Cummings, 102 Pa. 212, 48 Am. Rep. 199.

On the other hand, the opinion of Justice (then District Judge) Brown in The J. F. Card (D. C.) 43 Fed. 92 derives especial importance from the fact that he also wrote in The Osceola, and in The Card distinctly impugned the authority of Reed v. Canfield.[2] Nevertheless the latter case was not overruled by The Osceola, the question now under consideration was left open, and the very modern rulings above cited constitute a distinct weight of authority in favor of the doctrine laid down in The W. L. White.

It is noticeable, also, that, even in The J. F. Card, the court, though expressing views hostile to those of Story, J., concluded by awarding the seaman, not all he asked, but what seemed a reasonable allowance, a result wholly inconsistent with a strict limitation of right to a short voyage, and substantially like the award in Dougherty v. Thompson-Lockhart Co., supra.

On reason, also, we have no doubt that the seaman's right to curative effort should not cease with the wage period. The demand constitutes a lien, not for any specific sum of money, but for whatever reasonable sum may be appropriate to discharge that lien, which lien arose once and for all, and in its entirety, when the mariner became ill or wounded in the ship's service. It is nothing against a lien that it cannot be admeasured when it attaches, if suit can liquidate it; and in respect of this lien it is more accurate to regard items arising after

---

[2] The J. F. Card cites the City of Alexandria (semble) as opposed to Reed v. Canfield. This is a mistake; in the Alexandria the libel was dismissed, not because the seaman's right had terminated, but because the court thought the ship had fulfilled its obligation, as imposed by Reed v. Canfield.

voyage ended, not as new demands, but as existing, but inchoate or unliquidated, at date of lien; i. e., of illness or wound.

We hold that the rule was correctly enunciated by Judge Addison Brown and that the duty of the ship and owner persists for a reasonable time after the termination of voyage and wage relation. Of course it must begin before such termination.

The meaning of the phrase "maintenance and cure" is plain. By the custom of the sea the hiring of sailors has for centuries included food and lodging at the expense of the ship. This is their maintenance, and the origin of the word indicates the kind and to a certain extent the quantum of assistance due the sailor from his ship. We agree with the remark in The Mars, supra, that:

"The word 'cure' is used in its original meaning of care, and means proper care of the injured seaman, and not a positive cure, which may be impossible."

Furthermore, "cure" has been held to signify:

"The ordinary medical assistance and treatment in case of injury or acute disease, for a reasonable time. The ship is not bound to pay for (the sailor's) medication for the cure of a chronic disorder for an indefinite length of time." The Ella S. Thayer (D. C.) 40 Fed. 904.

Nor does the liability of the ship extend beyond—

"expense of effecting a cure by ordinary medical means. This does not include extraordinary medical treatment or treatment after cure effected as completely as possible in a particular case." The C. S. Holmes, supra.

[4] It thus appears that the limits of cure or care, both as to kind of treatment and time of continuance, must always depend on the facts of each particular case.

[5] We take cognizance of the existence of the Marine Hospital service, where at minimum expense, or (in proper cases) none, a seaman may be treated. It is not permissible for a person entitled to care from his ship (and equally entitled to have that care bestowed in a Marine Hospital) to deliberately refuse the hospital privilege, and then assert a lien upon his vessel for the increased expense which his whim or taste has created. It is one of the points upon which this record is insufficient that we are not properly informed of the knowledge of owners, master, or libelant as to what could be or might have been done in respect of Jones when he first complained of illness. Our inference from the meager testimony is that none of the parties concerned thought of the Marine Hospital; the fact being that, although libelant is technically a seaman, neither his master, employers, nor himself were sailors. Jones behaved like a landsman; indeed, he had worked as one not long before his employment on the tug, and at the time of this trial he was employed as the chauffeur of an auto-bus. It is not easy to adjust the rights of a seaman as between parties none of whom seem to think in terms of the sea.

As neither the owners nor master offered or suggested the Marine Hospital to this libelant, nor instructed him as to his rights in the premises, we think that the vessel remains responsible for cure; i. e., care in the way of maintenance and ordinary medical treatment for a reasonable time. This does not include such extraordinary expenses

as a private room in the Muhlenberg Hospital, nor the privilege of procuring an operation, at rates current for well-to-do persons (as this evidence indicates).

The fact is that libelant's conduct in regard to his illness was what would be expected from a land worker who "kept house" with an income ample for a childless couple (which was Jones' condition). He, of course, had the right so to do; but he has no right to charge his ship for the cost of illness, over and above what would have been appropriate in the case of a sailor living on shipboard.

Because no offer was made to send Jones to the Marine Hospital, we hold him entitled to recover for maintenance and cure as long as (so far as we can gather from this evidence) he would have remained in the Marine Hospital, had he gone there—which we take to be approximately the date of his discharge from the hospital in Plainfield. This is 3½ months, or 105 days (i. e. $105), plus his doctor's bill ($102), making a total of $207.

The decree below is modified, so as to award to libelant $207, without costs of this court or the District Court to either party; as so modified, it is affirmed.

