## UNITED STATES v. ROBINSON.
### No. 12321.

United States Court of Appeals
Fifth Circuit.

Nov. 26, 1948.

Rehearing Denied Jan. 22, 1949.

---

John H. Tappan and Percy C. Fountain U. S. Atty., both of Mobile, Ala., for appellant.

J. Edward Thornton, of Mobile, Ala., for appellee.

Before McCORD and LEE, Circuit Judges, and MIZE, District Judge.

MIZE, District Judge.

This is an appeal from a judgment of the court for the Southern District of Alabama. Appellee, George H. Robinson, filed his libel against the United States and sought recovery of $3,400 under the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq., for maintenance and cure as provided by the act. He averred that he was a seaman on the ship "American Fisher" and that his vessel was employed and operated as a merchant vessel by the government, acting through the War Shipping Adminstration. He alleged that he shipped on it about the 26th of October, 1945 for a voyage from Baltimore to a foreign port and return, and that while on the vessel, engaged in his duties, he was injured. He further alleged that by the Clarification Act, 50 U.S.C.A. Appendix, § 1291, the United States had consented to be sued and that his claim had been administratively denied.

The government answered, admitting that plaintiff was a seaman on the vessel from October 26, 1945, to November 3, 1945, but denies that he was employed thereafter. It admits that he was injured while on the vessel on October 26 and remained on the vessel until November 3, 1945, and was then removed from the vessel and placed in a hospital at the United States Naval Operating Base at Guantanamo, Cuba, where he remained until November 20, 1945, and was then transferred to the Naval hospital at Key West, Florida. The government further set up a defense that

580

the physical condition of the plaintiff in no way resulted from any injury received by him while a seaman on the Steamship "American Fisher"; that it had reimbursed him for his expenses for maintenance and cure through October 1, 1946; that the disease with which he is now suffering is incurable and that all improvement in his condition as reasonably may be expected to result from nursing, care and medical treatment was had on or before October 1, 1946, and that there was no further duty to provide treatment, nursing or care.

An agreed statement of facts was made at the trial as to many of the material facts, which is as follows:

"On the 25th day of August, 1945, Libelant was given a physical examination at the Marine Hospital in the City of New Orleans in the State of Louisiana, and a true and correct copy of the report of said examination, marked 'Exhibit 1,' is attached hereto and made a part hereof. On that date Libelant signed on as a steward on a vessel operated by Tankers Company, Incorporated, as Agent for War Shipping Administration.

"On the 27th day of October, 1945, the Libelant shipped on board the ship 'American Fisher,' operated by Tankers Company, Incorporated, for War Shipping Administration, for a voyage from the City of Baltimore, State of Maryland, to Puerto Rico and return. On that day, during the afternoon, while Libelant was engaged in the service of this vessel, which was then tied up at a dock in the City of Baltimore, and while on board the vessel, Libelant supervised the loading of stores aboard the vessel from a lighter tied up alongside the stern of the vessel. The stores were being hoisted from the lighter to the level of the deck by means of a fall which was secured to an I-beam which extended from the boat deck immediately above the place where Libelant was supervising the loading of the stores. The stores were hauled up with the fall until they were above the rail on the deck where Libelant was working. Longshoremen who were engaged in stowing these stores below, then pulled the stores while still secured to the fall over the rail and on to the deck, the hauling line being slacked sufficiently to allow the stores to be lowered on to the deck. Libelant was standing at the rail looking down into the lighter checking the stores yet to be stowed on board, while a three-hundred-pound (300) block of ice was hauled up in the fall and pulled over the rail preparatory to being let down on the deck. The longshoremen lost their hold on the ice and the ice swung back toward the rail where Libelant was standing and the block of ice struck him in the right rear lower chest and moved him against the rail, pinioning Libelant there. The blow received by Libelant was painful and knocked the breath temporarily out of Libelant. After a few minutes' rest, Libelant continued supervising the loading of stores and ultimately all of the stores were put below.

"Libelant continued about his duties during the remainder of the day, though he suffered some pain. That night Libelant retired for the night at about his usual time. At about one A.M. on the next morning, Libelant awakened in his bunk suffering extreme pain in his right rear lower chest. Libelant went to the Captain's quarters and reported his pain, there being no medical officer aboard, and was given aspirin. After taking the aspirin, Libelant returned to his bunk and slept fitfully throughout the remainder of the night. Libelant was unable to arise the next morning and the ship's master came to see him and asked if Libelant would like to go to the hospital. Libelant, thinking he had not been hurt seriously, stated that he did not wish to go to the hospital. The vessel sailed from Baltimore that day, October 27, 1945.

"On the 3rd day of November, 1945, the vessel was at sea. Libelant's condition had grown steadily worse and on that day it was such that the master of the vessel made arrangements with the United States Coast Guard at San Juan, Puerto Rico, for Libelant to be removed from the vessel. This was done on that day, and Libelant was taken to the Guantanamo Naval Operating Base where he was placed in the Naval Hospital, where he remained as a patient until the 20th day of November, 1945. A true and correct report of Libelant's medical history while a patient at the Naval Hospital at Guantanamo Bay, Cuba, marked

'Exhibit 2,' is attached hereto and made a part hereof.

"On the 20th day of November, 1945, Libelant was transferred to the United States Naval Hospital at Key West, Florida, at which he was a patient until the 21st day of December, 1945, on which date he was released. A true and correct copy of the report of the medical history of Libelant, issued by the United States Naval Hospital, Key West, Florida, marked 'Exhibit 3,' is attached hereto and made a part hereof.

"On the 23rd day of January, 1946, Libelant reported to the United States Marine Hospital at Mobile, Alabama, where he remains an out-patient to this date, reporting back to the hospital every two weeks. An abstract from the clinical record of the United States Marine Hospital at Mobile, as made on the 6th day of March, 1946, marked 'Exhibit 4,' is attached hereto and made a part hereof.

"On the 23rd day of July, 1946, Libelant received $1,632.46 in accordance with the terms of a release signed by him at that time, a true and correct copy of which is attached hereto marked 'Exhibit 5,' and made a part hereof.

"On the 26th day of October, 1946, Libelant was examined by the United States Marine Hospital, Mobile, Alabama, and a written report was made concerning his condition, a true and correct copy of which is attached hereto marked 'Exhibit 6,' and made a part hereof.

"On the 5th day of August, 1947, Libelant was examined at the instance of defendant by Doctors G. O. Segrest and P. J. M. Acker, who made a report on Libelant's condition.

"Upon admission to the Hospital at the United States Naval Operating Base, Guantanamo, Cuba, Libelant was suffering from Pleurisy which subsequently cleared up prior to the time of his discharge from the Key West Hospital.

"The voyage of the S.S. 'American Fisher,' during which the incident described in paragraph No. 3 of this agreed statement occurred, ended at Newark, New Jersey, on or about November 19, 1945.

"The above statement is submitted without prejudice to the right of either party to introduce additional pertinent evidence provided such additional evidence is not inconsistent with the above stipulation."

In addition to the agreed statement of facts, Libelant testified that he had been a seaman for fifteen or twenty years and had undergone a physical examination every time he signed on a vessel and had never been turned down. He said he was given a thorough examination on August 25, 1945, at the Marine Hospital in New Orleans; that his heart and blood were tested and his blood pressure taken, and at that time he was passed as fit for duty. He states that he still is receiving medical treatment from the Marine Hospital at Mobile and knows that they are giving him digitalis. The Government called Dr. G. O. Segrest and Dr. P. J. M. Acker, who testified that the appellee was suffering with arteriosclerosis with cardiac decompensation mild, with auricular fibrillation, and that in their opinion it was permanent, Dr. Acker saying that 80% of cases of arteriosclerosis were caused by age. They stated that appellee had suffered from pleurisy, evidently caused by the blow, and admitted that a blow could cause pleurisy. Dr. Acker stated that digitalis would steady a fibrillating heart: "It regulates the volume of blood drawn by the big blood vessels, and you slow it down so as to get a good even flow, that is what you want to do because when it fibrillates, he gets choked up in the chest and cannot breathe, and when you get the heart steady that disappears." There was read in evidence, without objection, a text which was admitted by one of the doctors as being authoritative, in which it was stated that auricular fibrillation may develop suddenly during infectious pneumonia. We shall not set out in detail the testimony of these experts, but it is a fair inference from the evidence that further treatment would be beneficial to him. In fact, it is probable that if he were taken off digitalis that his life would be shortened considerably.

The Government also offered in evidence a certified copy of Operations Regulation No. 108 promulgated by the Assistant Deputy Administrator for Ship of Operations for War Shipping Administration effective August 1, 1945, which undertook to set a

schedule for maintenance for licensed seamen and unlicensed seamen on vessels operated for War Shipping Administration. This Regulation promulgated by the Assistant Deputy Administrator provided that for maintenance and cure he should be allowed a sum of $3.50 per day. The document was objected to by the appellee, the objection was sustained and the document was excluded from consideration.

The trial court found that from the injury sustained on the vessel, appellee was hospitalized on November 3, 1945 and remained in the hospital until December 21, 1945, at which time he had recovered from his pleurisy, but was then suffering from arteriosclerosis, generally, resulting in arteriosclerotic heart disease and auricular fibrillation, which had not been manifest prior to the time he signed on the Steamship "American Fisher"; that since that time and up until the time of trial he had been an out-patient receiving treatment at the United States Marine Hospital at Mobile; and that he still is suffering from arteriosclerosis, heart disease and auricular fibrillation; that his condition is incurable, but that improvement may be expected from further treatment for auricular fibrillation so long as the present treatment continues, though no improvement may be expected from further treatment for arteriosclerotic heart disease. The trial court further found that appellee's condition became manifest and apparent during the period of his service on the vessel, regardless of whether this condition was latent prior to the time of the injury, and that the injury sustained by him on the vessel aggravated the pre-existent condition.

We think the trial court was justified by the record in its findings of fact. Appellant has assigned several errors, but they may be condensed into raising two propositions of law: (1) Did the court err in excluding the Regulation promulgated by the Assistant Deputy Administrator for Shipping Operations for War Shipping Administration? (2) Was there liability under the Act that would require further treatment?

■■ The court was correct in excluding from consideration the Regulation promul-gated by the War Shipping Administration because it is well settled that the right of the seaman to maintenance and cure for an illness which befalls him during his service may continue for a period beyond the duration of the voyage, whether he be at home or abroad, and even though the illness be not caused by the employment. Calmar S. S. Corporation v. Taylor, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed. 993. In that case it was held that the seamen's recovery must be measured by the reasonable cost of that maintenance and cure to which he is entitled at the time of the trial, including, in the discretion of the court, such amounts as may be needful in the immediate future for the maintenance and cure of a kind and for a period which can be definitely ascertained. It is clear from this authority that the War Shipping Administration had no power arbitrarily to fix a sum of $3.50 per day as being sufficient for maintenance and cure. This is a question of fact to be determined by the court from the evidence and, therefore, the lower court was correct in excluding the document.

■■ In determining the question presented by this appeal it is the duty of the appellate court to indulge a strong presumption of the correctness of the finding of fact of the trial court. The Ellenville, 4 Cir., 40 F.2d 47. We agree with the findings of fact made by the trial court. It being apparent from the facts that appellee will be benefitted and needs further care and treatment, it is clear that the duty of the government to give it arose from the relationship between the parties. The Calmar S. S. Corporation v. Taylor, supra [303 U.S. 525, 58 S.Ct. 653], together with the authorities therein cited, fully settle the correctness of the judgment of the trial court. The obligation is clearly set out by the court in that case in the following language:

"The ancient duty of a vessel and her owner to provide maintenance and cure for seamen injured or falling ill while in service was recognized and, to some extent, defined by this Court in The Osceola, 189 U.S. 158, 175, 23 S.Ct. 483, 47 L.Ed. 760. See also Chelentis v. Luckenbach S. S. Co., 247 U.S. 372, 38 S.Ct. 501, 62 L.Ed. 1171; Pacific S. S. Co. v. Peterson, 278 U.S. 130, 49 S.Ct. 75, 73 L.Ed. 220. The duty, which

arises from the contract of employment, Cortes v. Baltimore Insular Line, 287 U.S. 367, 371, 53 S.Ct. 173, 174, 77 L.Ed. 368, does not rest upon negligence or culpability on the part of the owner or master, Id.; The City of Alexandria, D.C., 17 F. 390; The Mars, 3 Cir., 149 F. 729, 731; Sorensen v. Alaska S. S. Co., D.C., 243 F. 280, affirmed 9 Cir., 247 F. 294; Brown v. The Bradish Johnson, C.C., 4 Fed.Cas.No.1992, 1 Woods 301, nor is it restricted to those cases where the seamen's employment is the cause of the injury or illness, The Wensleydale, D.C., 41 F. 829; The Bouker No. 2, 2 Cir., 241 F. 831. It is not an award of compensation for the disability suffered, The Wanderer, C.C., 20 F. 140, 143, although breach of the duty may render the owner liable for the consequential damages suffered by the seaman. Cortes v. Baltimore Insular Line, supra, 287 U.S. 367, 371, 53 S.Ct. 173, 174, 77 L.Ed. 368. The maintenance exacted is comparable to that to which the seaman is entitled while at sea, The Henry B. Fiske, D.C., 141 F. 188, 192; The Mars, D.C., 145 F. 446, 447, affirmed 3 Cir., 149 F. 729; The Bouker No. 2, supra, 2 Cir., 241 F. 831, at page 836, and 'cure' is care, including nursing and medical attention during such period as the duty continues. Whitney v. Olsen, 9 Cir., 108 F. 292, 297 and cases cited; Dougherty v. Thompson-Lockhart Co., D.C., 211 F. 224, 227."

The obligation for maintenance and cure does not extend indefinitely when he is suffering from an incurable disease or ailment, but it does extend to a reasonable time after the voyage in which to effect such improvement in the seaman's condition as may be reasonably expected from nursing care and medical treatment. With reference to this obligation, the court, in the Taylor case, supra, said:

"So far as we are advised, it is without support in the authorities. We can find no basis for saying that, if the disease proves to be incurable, the duty extends beyond a fair time after the voyage in which to effect such improvement in the seaman's condition as reasonably may be expected to result from nursing, care, and medical treatment. This would satisfy such demands of policy as underlie the imposition of the obligation.

Beyond this we think there is no duty, at least where the illness is not caused by the seaman's service."

The trial court was correct in awarding appellee a sum of money sufficient for his maintenance and cure up until the date of the trial in the court below, and its judgment is affirmed.

Affirmed.