## MORRIS v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. November 10, 1924.)

No. 59.

**1. Seamen ⬉30—Defiant seaman can be punished by captain.**

Seaman, who was defiant and subversive to discipline that must be maintained at sea, could be punished by captain, under Act March 4, 1915, § 7, subd. 4 (Comp. St. § 8380).

**2. Seamen ⬉11—Injured seaman held entitled to maintenance and cure.**

Seaman, who sustained injury while at sea, was entitled to maintenance and cure.

**3. Seamen ⬉11—Evidence held insufficient to prove illness of seaman from thrombosis was due to injury or maltreatment on board ship.**

In libel by seaman against owner for maintenance and cure, evidence *held* insufficient to prove that illness from thrombosis was due to injury or maltreatment received by seaman while on shipboard.

**4. Seamen ⬉11—Captain, who had no means of affording medical aid for injured seaman on board, should have obtained aid at intermediate port.**

On injury to seaman during voyage, it was captain's duty to obtain medical aid at intermediate port, if he had no means of affording medical attention on board.

**5. Seamen ⬉11—Ship required to provide injured seaman maintenance and cure, notwithstanding captain's error of judgment in thinking that seaman was shamming.**

Captain's error of judgment in believing that injured seaman was shamming did not relieve ship from responsibility of providing maintenance and cure.

**6. Seamen ⬉11—Measure of damages recoverable by injured seaman, on master's refusal to provide medical aid and maintenance, stated.**

The measure of damages recoverable by injured seaman on master's refusal to afford medical aid and maintenance is the consequential damages, but does not include damages for pain and suffering nor compensation for injury due to physical incapacity.

**7. Seamen ⬉11—Injured seaman, forced to work at time when he was entitled to maintenance in rest for cure, could recover compensation for such period.**

Injured seaman, who was forced to work at time when he was entitled to be maintained in rest for cure, was entitled to compensation for such period.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by Charles Morris against the United States for maintenance and cure while in service on the United States steamship Polybius. Decree of dismissal, and libelant appeals. Decree modified.

Jacob L. Polstein, of New York City (Harold R. Medina and Leander Shelley, both of New York City, of counsel), for appellant.

William Hayward, of New York City (John C. Donovan, of Richmond Hill, N. Y., of counsel), for appellee.

Before ROGERS and MANTON, Circuit Judges, and LEARNED HAND, District Judge.

MANTON, Circuit Judge. This libel is based on alleged failure and neglect of the master of the steamship Polybius to provide medical care or treatment when the appellant suffered a ventral hernia after a few days out from Southhampton on a voyage from Antwerp to New York City. It was found below that this hernia was sustained while appellant was in the service of the ship. No medical attendance was given to him during the balance of the voyage. The vessel made a call at Porto Delgada, in the Azores. The appellant says that he asked there for medical aid and to be relieved of his obligations to the ship, so that he might stop there and receive some medical care. He says that this request was

denied by the master. The appellant shipped as a "work-away" at one cent a month. He was set to work, under the boatswain, cleaning up the vessel, painting, scraping, and carrying heavy boards, which were used as scaffolding. When the vessel was two days out, he was carrying two heavy pails of sugee, a mixture used for cleaning, and while so doing sustained a severe strain, with the resulting hernia. There is evidence that he did not have this hernia prior to this time, which affords corroboration for his statement and supports the finding below.

After this day, he said he complained to the captain, asking for medical attention half a dozen times, without result. He refused to work, claiming that he was unable to do so because of his sickness. The Polybius remained at Porto Delgado five or six days before resuming her voyage to New York. His testimony, if believed (it was not below), warranted the claim that he was ill-treated in so far as food, place to sleep, and obligation to work was concerned. A day out from New York he was asked to clean the smokestack in a storm, and for failure to do so was confined in chains. His confinement, according to his own story, was very cruel and inhuman. Indeed, if believed, it would be such as would endanger his life. There was corroboration of this confinement by the captain's waiter and the boatswain. The boatswain says he saw him at various times from 9 in the morning until quarter of 5 in the afternoon in a stooped position in the room referred to as the supercargo room. It was located in the bulkhead end of the vessel, and required him to be placed in a semi-sitting position on a ledge between the bunk and the partition. He said his hands were manacled and fastened to a brass ring on one of the drawers, so that they were only three or four inches from the floor. The District Court has analyzed the testimony as to his confinement and has refused to believe it. We need not pass on the truth of this story, but the facts are irrelevant, even if true.

But he sustained a hernia, and received no medical care for it, and it appears, without contradiction, that on the second day after his arrival in New York he went to the United States Marine Hospital where he was operated on and obliged to remain for three weeks in endeavoring to be cured of this sickness. He afterwards developed thrombosis of the veins of his right thigh on the outer surface, which appeared some three weeks after the operation of the hernia, when he got up and began to walk. This kept him in the hospital for seven months longer, with constant hemorrhages from the wound caused by the operation for thrombosis of the veins. It was accompanied by pain and is a permanent disability, which will prevent him from doing heavy work.

[1-3] The argument is advanced that this thrombosis resulted from his maltreatment while on board the vessel. It cannot be doubted that, if he was defiant and subversive to discipline that must be maintained at sea, the captain had full authority to punish him. Section 7 (4) of chapter 153 of the Laws of 1915, 38 Stat. 1167 (Comp. St. § 8380). He was entitled to maintenance and cure while sick with hernia, and, of course, the same would be true of his illness from thrombosis, if it were established with reasonable certainty that the injury or maltreatment on shipboard was a competent producing cause thereof. However, the medical testimony does not warrant the claim of the appellant that the thrombosis resulted from either. That testimony establishes that the mere position the patient assumed during the period of his confinement would not cause thrombosis, unless during that time he had received some trauma or contusion of the thigh, which later led on to the formation of a thrombus. It was testified that the thrombus occurred a month later, and further:

"Q. And the poor circulation of blood for 24 or 30 hours, is that not a competent producing cause for the coagulation of blood? Include with that the fact that the man is suffering from a hernia. A. Thrombosis occurring a month later, I would consider that this predisposing element would be very trifling.

"Q. Do you know of anything of that kind in the hospital which would cause thrombosis a month later, or three weeks after the operation? A. Thrombosis is not an infrequent complication following an operation of any kind.

"Q. What would be the effect of chaining a man, or keeping him in a position bending over, on a rupture of the abdomen? A. Well, it couldn't have any effect on the rupture. It would be a very distressing thing.

"Q. Assuming that he was chained in that position, and that he was there for 24 to 30 hours; in your judgment, did that have any effect on the condition of his leg? Was that the cause of the condition that

you found in his leg? A. It couldn't cause the varicosities for the enormous blood vessel tumor. It would be a very painful thing. I can't say that it would do anything else, except cause pain, and very severe pain."

And further:

"Thrombosis is caused from an infinite number of causes. * * * Stasis is a real cause; that is, the slowing down of the blood. Then there are added causes that come in, usually infection and injury.

"Q. Do you think that the stooping posture, taking into account your examination of this man, had anything to do with the thrombosis? A. I do not."

The record does not disclose any testimony which would show that this injury or confinement would be a competent producing cause for the thrombosis; but the contrary is shown. Under the circumstances, the appellee would not be obligated to maintain the appellant or to pay for the effort to effect a cure from this branch of his sickness. The appellant, however, would be responsible for his cure and maintenance during the period he was ill with hernia. The Iroquois, 194 U. S. 240, 24 S. Ct. 640, 48 L. Ed. 955. There is no proof of either medical expense or hospital cost. He was treated in the United States Marine Hospital. This is not a suit to recover damages for putting the appellant in irons, or compelling him to do work while he was sick, or for giving him insufficient food. There are no such allegations in the libel as pleaded. The libel in paragraph fifth reads as follows:

"That on or about November 10, 1920, and during the course of the aforesaid voyage on the aforesaid steamship upon which said Charles Morris was employed as above described, he suddenly sustained severe personal injuries of such nature as to totally incapacitate him, arising out of the course of his employment upon said steamship, in that, while carrying two pails of water about said ship, he sustained a severe sprain and hernia, owing to the excessive weight of said two pails, which he had been instructed by his superior officers on said ship to carry."

In paragraph sixth he pleads of having given notice of his injuries to the captain, and that, notwithstanding such notice, his injuries were contributed to and aggravated by reason of the failure and refusal of the captain and other officers in charge of said steamship "to furnish said Charles Morris with the reasonably good medical attention

they were under a duty to furnish said Charles Morris as aforesaid, put said Charles Morris in chains, notwithstanding his said injuries, forced him to work, notwithstanding same, and otherwise maltreated and abused him, to such an extent as to cause him to sustain aggravation of the aforesaid injuries in the manner hereinafter more particularly described, all without any provocation of any kind on his part in any wise contributing thereto."

Where a seaman was not accorded that maintenance and cure which the law imposed upon the shipowner, we held in The Bouker No. 2, 241 F. 831, 154 C. C. A. 537, that these items might be recovered, and we said:

"We hold that the rule was correctly enunciated by Judge Addison Brown, and that the duty of the ship and owner persists for a reasonable time after the termination of voyage and wage relation. Of course, it must begin before such termination. The meaning of the phrase 'maintenance and cure' is plain. By the custom of the sea the hiring of sailors has for centuries included food and lodging at the expense of the ship. This is their maintenance, and the origin of the word indicates the kind and to a certain extent the quantum of assistance due the sailor from his ship. We agree with the remark in The Mars, supra [149 F. 729, 79 C. C. A. 435], that: 'The word "cure" is used in its original meaning of care, and means proper care of the injured seaman, and not a positive cure, which may be impossible.'

"Furthermore, 'cure' has been held to signify: 'The ordinary medical assistance and treatment in case of injury or acute disease, for a reasonable time. The ship is not bound to pay for [the sailor's] medication for the cure of a chronic disorder for an indefinite length of time.' The Ella S. Thayer (D. C.) 40 F. 904. Nor does the liability of the ship extend beyond—'expense of effecting a cure by ordinary medical means. This does not include extraordinary medical treatment or treatment after cure effected as completely as possible in a particular case.' The C. S. Holmes, supra [(D. C.) 209 F. 970]. * * * The fact is that libelant's conduct in regard to his illness was what would be expected from a land worker, who 'kept house' with an income ample for a childless couple (which was Jones' condition). He, of course, had the right so to do; but he has no right to charge his ship for the cost of illness, over and above what would have been appropri-

ate in the case of a sailor living on shipboard.

"Because no offer was made to send Jones to the Marine Hospital, we hold him entitled to recover for maintenance and cure as long as (so far as we can gather from this evidence) he would have remained in the Marine Hospital, had he gone there."

See, also, The Van der Duyn (C. C. A.) 261 F. 887.

[4-7] During the time of his illness on the voyage to New York, which lasted from November 7th to December 19th, about five weeks, the appellant should have been relieved from duty and at the same time received medical attention. The treatment he did receive when he landed in New York cured him of his hernia. At least there was no proof of permanency of that injury, and there can be no allowance for future doctor bills which might be incurred in a reasonable effort to cure him in the future. Indeed, it was the duty of the captain of the vessel to obtain medical aid at the intermediate port of the Azores for the injured seaman if he had no means of affording medical attention on board. The Governor (D. C.) 230 F. 857; The Badger (D. C.) 218 F. 81; Unica v. United States (D. C.) 287 F. 177. Even though the captain was mistaken, and committed an error of judgment in believing that the appellant was shamming, this fact does not relieve the ship from the responsibility it owed to the seaman. Unica v. U. S., supra. The consequential damage due to the failure to afford medical aid and maintenance is a measure of damages which is to be awarded. Recoveries have been permitted for neglect to furnish the proper medical care and treatment in actions instituted for consequential damages. North Alaska Salmon Co. v. Larsen, 220 F. 93, 135 C. C. A. 661; The Eva B. Hall (D. C.) 114 F. 755; The Fullerton, 167 F. 1, 92 C. C. A. 463; The City of Alexandria (D. C.) 17 F. 390. The right of recovery for maintenance and cure does not allow recovery for pain and suffering or compensation for injury due to physical incapacity. The Bouker No. 2, supra. A right of action for damage for maltreatment is not pleaded here. Appellant makes no proof of loss of wages or medical expense. But he was obliged to work about five weeks when he was entitled to be maintained in rest for cure. He should be compensated for this period.

We accordingly modify the decree by allowing him $250.